IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| 55 BRAKE, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>AUDI OF AMERICA, et al.,<br><br>        Defendants. | Case No. 1:CV 08-177-BLW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW (Inequitable Conduct Issue)** |

## INTRODUCTION

The Court held a bench trial on the single issue of whether plaintiff 55 Brake obtained the '587 patent through inequitable conduct before the United States Patent Office. Following the bench trial, the parties submitted further briefing that was completed on May 2, 2011. The matter is now at issue. In these Findings of Fact and Conclusions of Law the Court finds that plaintiff 55 Brake did not obtain the '587 patent through inequitable conduct.[1]

---

[1] Following the bench trial, plaintiff moved to admit exhibits 1045, 1047, 1050, 1061, and 1062. VGA has no objection to these exhibits except for 1061. In ruling for the plaintiff, the Court did not examine exhibit 1061. Accordingly, the Court will admit exhibits 1045, 1047, 1050, and 1062, pursuant to agreement of the parties and will deny plaintiffs' admission of exhibit 1061.

**Findings of Fact & Conclusions of Law - 1**

# FINDINGS OF FACT

**Background**

1. Plaintiff 55 Brake, L.L.C. is an Idaho limited liability company.

2. Defendant Volkswagen Group of America, Inc. (VGA) is a corporation organized and existing under the laws of the State of New Jersey.

3. The patent at issue – U.S. Patent No. 6,450,587 to MacGregor et al. (the '587 patent) – is entitled "Vehicle Brake Safety System Apparatus and Methods" and issued on September 17, 2002.

4. The '587 patent describes an automatic brake control system for cars that detects unsafe conditions through sensors and automatically applies (or maintains) the brake.

5. The unsafe conditions that trigger the brake include (1) a driver exiting the vehicle without applying the parking brake or turning off the vehicle, (2) a wheelchair lift being extended, (3) seat belts disengaged, (4) low tire pressure, and (5) a door which is ajar.

6. The system was originally invented by David MacGregor, Noble Hamilton, and Dale Maslonka, and later assigned to 55 Brake.

7. In this lawsuit, 55 Brake claims that defendants, including VGA, are infringing the '587 patent.

8. VGA raised the defense that the '587 patent is unenforceable for 55 Brake's alleged inequitable conduct for the following two reasons:

    a.    "(i) after the '587 patent had expired on September 18, 2006 due to an intentional failure to pay the required maintenance fee, 55 Brake, through its attorney Robert H. Epstein, filed a 'Petition to Accept Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent' with the Patent and Trademark Office on August 14, 2007, making the false or un-investigated statement that '[t]he delay in payment of the maintenance fee to this patent was unintentional,' which led to the reinstatement of the '587 patent"; and

    b.    "(ii) during prosecution of the application leading to the issuance of the '587 patent, at least the inventors, G. David MacGregor, Noble Hamilton, and Dale Maslonka, or their attorneys or agents who prepared or prosecuted the application, Ken J. Pedersen and Barbara S. Pedersen, breached their duty of candor and good faith in dealing with the Patent and Trademark Office, and misled the Patent and Trademark Office, by failing to disclose to the Patent and Trademark Office all information known to those individuals to be material to patentability of the claims of the patents, for example the information related to the Deitchman patent and the Semmler patent application, as described." *See Amended Answer (docket no. 121).*

9. The Court will set forth the facts relating to each of these two claims.

**Prosecution of the '587 Patent**

10. The '587 patent was prosecuted by patent agent, Barbara S. Pedersen.

**Findings of Fact & Conclusions of Law - 3**

11. On November 28, 2000, Pedersen filed the '587 patent application.

12. On December 4, 2000, just a few days after filing the '587 application, Pedersen filed an international application under the Patent Cooperation Treaty (PCT).

13. The Court will refer to the PCT international application as the '931 PCT application.

14. The '931 PCT application corresponded to the U.S. '587 patent application, and was filed on behalf of the same inventors as are listed on the '587 patent.

15. International applications submitted under the PCT have two phases.

16. In the first phase, the International Search Authority (ISA) conducts a search for prior art, and issues a written report on its findings – the International Search Result (ISR) – including an opinion on whether the matter is patentable. If a more detailed report is desired, the applicant can request an examination by the International Preliminary Examination Authority (IPEA). The IPEA Report lists the prior art and contains a more detailed analysis of patentability than the ISR.

17. In the second phase – or national phase – the signatory countries to the PCT – including the United States – consider the ISR or IPEA Report, and make the final determination whether to actually issue a patent.

18. The claims filed in the '931 PCT application were identical to the original claims filed in the '587 patent application, including respective claims 1 and 27 in both applications.

19. On December 15, 2000, Pedersen submitted an Information Disclosure Statement

**Findings of Fact & Conclusions of Law - 4**

(the "First IDS") to the U.S. Patent Office in connection with the '587 patent application.

20. The First IDS disclosed 36 patent documents as relevant to the '587 patent application, including U.S. Patent No. 4,838,617 to Deitchman.

21. On April 27, 2001, the ISA issued its ISR on the '931 PCT application. *See Exhibit 2117*.

22. The ISR listed a number of existing patents "considered to be relevant," and assigned each patent to a certain category of relevance.

23. For example, a patent assigned to Category X was defined as a "document of particular relevance. The claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone."

24. The ISR at issue here assigned the Deitchman patent and the Semmler patent application to Category X, indicating that the inventions described in these two filings rendered the brake system described in the '931 PCT patent application unpatentable because it was not novel.

25. The ISR contains no further analysis, and does not explain why the two references received an "X" designation.

26. Once she received the ISR, Pedersen requested an IPEA Report.

27. When Pedersen received the ISR, she had not previously disclosed the Semmler patent to the U.S. Patent Office in connection with the '587 patent prosecution.

28. On July 25, 2001, after receiving the ISR, Pedersen submitted a second

**Findings of Fact & Conclusions of Law - 5**

Information Disclosure Statement (Second IDS) to the U.S. Patent Office in connection with her prosecution of the '587 patent.

29. In the Second IDS, Pedersen informed the U.S. Patent Office of the Semmler patent application, written in German, and submitted a letter, written by Sven Evers, an engineer, translating a portion of the application, and rendering his opinion on its relevance.

30. In the letter, Evers translates into English a detailed description of the braking control system set forth in the Semmler patent application and also provides his opinion that the application has "little bearing on what 55 Brake Company does, mainly because this patent focus [sic] mainly on track/rail based vehicles." *See Exhibit 2121* at VWGOA0024992.

31. In addition to this explanation of the Semmler patent application, Pedersen's Second IDS also informed the U.S. Patent Office that she was pursuing an international application, and that the International Search Authority (ISA) had issued an ISR on April 27, 2001. *See Exhibit 2121* at VWGOA 24988-93.

32. The ISR was officially published on September 13, 2001, and was sent to the U.S. Patent Office at that time, nearly a year before the '587 patent was issued. *See Trial Transcript* at pp. 227, 230, 242-43, 279.

33. Pedersen understood this procedure whereby the ISR would be mailed to the U.S. Patent Office and she relied upon it in this case. *Id*. at 242-43.

34. On November 13, 2001, the IPEA issued its Report on Pedersen's '931 PCT

**Findings of Fact & Conclusions of Law - 6**

international application, and its conclusions were similar to those contained in the ISR.  *See Exhibit 2122.*

35. The IPEA Report concluded that claim 27 of the '931 PCT application was not novel in view of Deitchman, and that claim 1 was not novel in view of Semmler.

36. Pedersen did not disclose the IPEA Report to the U.S. Patent Office in connection with the prosecution of the '587 patent.

37. On September 17, 2002, the U.S. Patent Office issued the '587 patent.

38. On September 23, 2010, VGA filed a Petition for Ex Parte Reexamination of the '587 patent.

39. The request included an assertion that the Deitchman patent rendered several issued claims invalid, including claim 9.

40. On December 10, 2010, the U.S. Patent Office granted VGA's request for reexamination, and issued an Office Action rejecting claims of the '587 patent on several grounds, including a rejection claim 9 was not novel in view of the Deitchman patent.

41. The U.S. Patent Office found Deitchman to present a "substantial new question of patentability."

**Patent Expiration and Reinstatement**

42. 55 Brake initially planned to make and sell the brake systems described in the '587 patent.

43. But over the years it only sold about 125 brake systems.

**Findings of Fact & Conclusions of Law - 7**

44. In July 2003, Jeffrey Fletcher, who had been President and CEO of 55 Brake since 2001, resigned from that position, and Joe Holmes, who had joined 55 Brake in January 2003, became 55 Brake's President and CEO.

45. In 2004, 55 Brake granted a license to all of its patents – including the '587 patent – to WABCO.

46. Pursuant to the license agreement, WABCO made an up-front payment of $250,000 to 55 Brake and made periodic royalty payments that continue today. *See Trial Transcript* at p. 91.

47. 55 Brake was contractually obligated to maintain the patents under the WABCO agreement. *Id*; *Exhibit 2020.*

48. Around November 2004, 55 Brake refocused its business purpose from manufacture and sale of products to licensing its patent rights.

49. In December 2004, 55 Brake restructured itself from a corporation to an LLC, with the LLC's principal business activity being the licensing of 55 Brake's patents.

50. Apart from its agreement with WABCO, all of 55 Brake's efforts to license its patents were unsuccessful.

51. 55 Brake stipulated at trial as follows: "During the relevant time period, 55 Brake had little income and was required to obtain loans from its members to meet payment obligations to creditors that demanded payment." *See Trial Transcript* at p. 38 ll. 16-21.

52. The '587 patent was, according to Holmes, the "lifeblood" of 55 Brake and he

**Findings of Fact & Conclusions of Law - 8**

could not conceive of abandoning it.

53. Even with serious financial difficulties, 55 Brake was able to get money from investor Jim Banducci of Emerald Investments to cover operational costs, including maintenance fees for patents.

54. At this point, 55 Brake was represented by the law firm of Honigman Miller Schwartz and Cohn LLP ("Honigman"), and specifically by partner Joseph Coppola.

55. Coppola monitored the maintenance fee due dates for 55 Brake's patents, including the '587 patent.

56. Between October 2005 and January 2006, the Honigman firm reminded 55 Brake's President and CEO Joe Holmes repeatedly that the maintenance fee for the '587 patent was due.

57. At the end of January 2006, Holmes left 55 Brake.

58. When Holmes left, Jeffrey Fletcher returned to take over the administrative duties of 55 Brake, which included the payment of patent maintenance fees.

59. Fletcher testified – credibly – that he did not receive any notices from the Honigman firm that the patent maintenance fees were due.

60. VGA alleges that Fletcher's denial is contradicted by a print-out from the Honigman firm database carrying a notation by Coppola's secretary, Joyce Krumpe, as follows: "sent reminder to Jeff Fletcher on 4/28/06." *See Exhibit 2093.* The content of that "reminder" was not established by VGA. Coppola

**Findings of Fact & Conclusions of Law - 9**

merely testified that "presumably" the "reminder" refers to the "maintenance fee being due." *Transcript* at p. 62. Moreover, there is no indication on the print-out whether Fletcher acknowledged receiving any "reminder." Fletcher himself denied receiving any such notice, and testified that the patents were "critical" to the company and to the licensing agreement they had with WABCO, and that he had no intent to let the patent expire. *Id*. at p. 82. Lending credence to Fletcher's denial about receiving any notice from Coppola is a letter from Coppola to WABCO in 2006 stating that Fletcher's telephone number is "no longer in service" and complaining about the "difficulty . . . in contacting anyone from 55 Brake . . . ." *See Exhibit 1060.*

61. Because the Court finds Fletcher's testimony credible, and in light of the evidence discussed above, the Court finds that even if Coppola sent a reminder to Fletcher about the maintenance fees, it did not reach Fletcher.

62. Fletcher left 55 Brake in August of 2006 to deploy with the U.S. Marines.

63. It was upon Fletcher's return in 2007 that he first learned that the patent had expired. He was "extremely surprised," and "very upset" because the '587 patent was "one of the key patents the company rested on." *Id*. at p. 88.

64. In August of 2006, when Fletcher deployed with the Marines, he turned over his duties to 55 Brake's biggest shareholder David MacGregor.

65. In 2006, MacGregor closed the office of 55 Brake and transferred the company's files to his house in a horse trailer.

66. MacGregor was a rancher, whose primary job at that time was to take care of his cattle.

67. MacGregor had no assistants to help him with administrative duties such as paying patent fees.

68. He was so inept as an administrator that he mistakenly closed the 55 Brake bank account into which WABCO was still making its royalty payments.

69. The first maintenance fee for the '587 patent was due between September 17, 2005 and September 17, 2006.

70. The fee was $900 if paid between September 17, 2005 and March 17, 2006, but increased to $1,030 if paid during the grace period between March 18, 2006 and September 17, 2006.

71. 55 Brake did not pay the maintenance fee by the initial March 17, 2006, due date.

72. 55 Brake did not pay the maintenance fee by the ultimate due date, September 17, 2006, and the '587 patent expired as a result.

73. On October 30, 2006, the Honigman firm discovered that the '587 patent had expired.

74. Two days later, on November 1, 2006, Honigman partner Joseph Coppola had a telephone conversation with MacGregor.

75. Coppola recollects notifying MacGregor about the '587 patent's expiration. MacGregor disagreed, and testified that "either he didn't say [that] or I didn't understand it. I don't know which." *See Trial Transcript* at p. 142.

**Findings of Fact & Conclusions of Law - 11**

76. Another two days later, on November 3, 2006, Coppola sent an e-mail to MacGregor's then-existing e-mail address stating that the '587 patent "went abandoned for failure to pay maintenance fees" and that "[t]ime is of the essence for reviving this patent." *See Exhibit 2076.*

77. While MacGregor continued to use this e-mail address into February of 2007, at the time of Coppola's e-mail in November of 2006, MacGregor was in the process of "phasing out" that address because "[i]t didn't work very well." *See Trial Transcript* at p. 153.

78. MacGregor testified – credibly – that he first realized that the '587 patent had expired in a meeting in August of 2007, in the Denver airport.

79. At the Denver airport, MacGregor and Babbitt met with attorneys Ed Goldstein and Matthew Prebeg.

80. MacGregor did not intend at any time to abandon the '587 patent or let it expire.

81. At that 2007 meeting, MacGregor retained Goldstein to reinstate the '587 patent.

82. On August 10, 2007, Goldstein contacted Robert Epstein, and asked him to prepare a petition to reinstate the '587 patent.

83. Babbitt was then asked to interview the managing members of 55 Brake with respect to the '587 patent's expiration.

84. He interviewed Mr. MacGregor, Mr. Holmes, Mr. Fletcher, and Mr. Banducci.

85. Each of these men told Babbitt that they did not intend to let the '587 patent expire, and that information was forwarded to Epstein.

**Findings of Fact & Conclusions of Law - 12**

86. On August 14, 2007, Epstein signed and filed with the Patent Office a "Petition to Accept Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent" for the '587 patent (the "Reinstatement Petition"), relying on Babbitt's email.

87. In the Reinstatement Petition, Epstein stated: "The delay in payment of the maintenance fee to this patent was unintentional."

88. On February 29, 2008, the U.S. Patent Office granted 55 Brake's Reinstatement Petition.

89. On April 21, 2008, 55 Brake filed its complaint in this action.

## CONCLUSIONS OF LAW

### Jurisdiction & Venue

90. This action arises under the patent laws of the United States at 35 U.S.C. §§ 271 & 281.

91. This Court has personal jurisdiction under 28 U.S.C. § 1338(a) over both 55 Brake's original claims for patent infringement and VGA's counterclaim and affirmative defense of inequitable conduct.

92. Venue is proper in this Court under 28 U.S.C §§ 1391(b) and (c) and 1400(b).

93. This Court must follow the precedent of the Federal Circuit in a case such as this arising under the patent laws. *See Computrol, Inc. v. Lowrance Electronics, Inc.*, 893 F.Supp. 1440, 1445 (D.Id.1994).

### Inequitable Conduct – Failure to Disclose

**Findings of Fact & Conclusions of Law - 13**

94. There is a strong presumption of validity for issued patents. *See* 35 U.S.C. § 282.

95. The party asserting the invalidity of a patent bears the burden of proving each element of invalidity by clear and convincing evidence. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1326 (Fed. Cir. 2004).

96. To prove that a patent is invalid based on inequitable conduct, VGA must show, by clear and convincing evidence, that 55 Brake: (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information; and (2) did so with intent to deceive the PTO. *Cancer Research Technology Ltd. v. Barr Laboratories, Inc.*, 625 F.3d 724, 732 (Fed. Cir. 2010).

97. Both the materiality and intent to deceive elements of the inequitable conduct inquiry must be proven by clear and convincing evidence. *Cancer Research*, 625 F.3d at 732.

98. However, the law precludes a finding of inequitable conduct when there is a plausible, good-faith explanation for why information was not cited to the PTO. *Leviton Mfg. Co. v. Univ. Sec. Instruments, Inc.*, 606 F.3d 1353, 1362-63 (Fed. Cir. 2010).

99. To establish 55 Brake's intent under the clear and convincing evidence standard, VGA "must show that [55 Brake] made a deliberate decision to withhold a known material reference." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1331 (Fed. Cir. 2009).

100. The "[i]ntent to deceive is an independent element of inequitable conduct, and must be independently established by clear and convincing evidence." *Astrazeneca Pharm., LP*, v. *Teva Pharmaceuticals USA, Inc.,* 583 F.3d 766, 776 (Fed.Cir. 2009).

101. The required intent to deceive "cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1355 (2008).

102. "Evidence of mistake or negligence, even gross negligence, is not sufficient to support inequitable conduct in patent prosecution." *Astrazeneca Pharm., LP*, 583 F.3d at 776.

103. Because the intent and materiality elements of the inequitable conduct analysis require distinct factual inquiries, a trial court also cannot find the intent to deceive based on materiality alone. *Cancer Research*, 625 F.3d at 733.

104. Information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *See Golden Hour Data Systems, Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1374 (Fed. Cir. 2010).

105. Courts also look to Patent Rule 56 for guidance, which states: "[I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a

claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (I) Opposing an argument of unpatentability relied on by the [PTO], or (ii) Asserting an argument of patentability. *Id.*; 37 C.F.R. § 1.56(a).

106. Information is not material where it "is 'simply cumulative to other references,' i.e., if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of Univ. of Cal. v. Eli Lilly Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997).

107. A search report generated by a foreign patent authority in connection with the prosecution of a foreign counterpart application does not create an additional category of material information separate from the underlying references themselves. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) (holding that while "international search reports may contain information material to patentability if they contain closer prior art than that which was before the United States examiner, it is the reference itself, not the information generated in prosecuting foreign counterparts, that is material to prosecution in the United States").

108. "The details of foreign prosecution are not an additional category of material information." *Id.*

**Inequitable Conduct – False Reinstatement Representation**

109. Reinstatement of patents is governed by 35 U.S.C. § 41(c)(1) and 37 C.F.R. § 1.378.

Findings of Fact & Conclusions of Law - 16

110. 37 C.F.R. § 1.378(c), states: "Any petition to accept an unintentionally delayed payment of a maintenance fee…must be filed within twenty-four months after the six-month grace period…and must include: (1) The required maintenance fee set forth in § 1.20(e) through (g); (2) The surcharge set forth in § 1.20(i)(2); and (3) A statement that the delay in payment of the maintenance fee was unintentional.

111. The entire period of delay must be unintentional, not just the initial failure to pay by the fee deadline. *See Manual of Patent Examining Procedure § 711.03(c); Field Hybrids, LLC. v. Toyota Motor Corp.*, 2005 WL 189710 (D. Minn. Jan. 27, 2005).

**Analysis – Failure to Disclose**

112. VGA has not carried its burden of proving by clear and convincing evidence that Pedersen failed to disclose material information with the intent to deceive the U.S. Patent Office.

113. Before the '587 patent issued, Pedersen disclosed to the U.S. Patent Office the Deitchman patent, the Semmler patent application, and the existence of the ISR.

114. While Pedersen did not disclose the actual ISR to the U.S. Patent Office as part of the prosecution of the '587 patent, she did disclose the fact that an ISR had been issued on her international application and relied on the standard practice that it would be sent to the U.S. Patent Office when published – in this case, the publication date was nearly a year before the '587 patent issued.

115. While it is true that Pedersen did not send the IPEA Report to the U.S. Patent

Office, that Report adds little to the ISR because both conclude that claims 1 and 27 are not novel under Deitchman and Semmler and neither contains any detailed analysis explaining that conclusion.

116. Given Pedersen's disclosure of the existence of the ISR, and its availability to the U.S. Patent Office months in advance of the patent's issuance, Pedersen's failure to disclose the actual ISR and the IPEA Report cannot be deemed a failure to provide material information with an intent to deceive.

117. While Pedersen did not provide a full translation of the Semmler patent application from the German, she did provide the Evers translation that contained a description of the operation of the system in Semmler along with Evers' opinion about it relevance.

118. VGA argues that the availability of the ISR meant nothing because the Evers letter misled the examiner into thinking there was no reason to seek out and examine the ISR. But this is mere speculation because neither the examiner nor any expert testified in support of VGA on this issue. VGA does not challenge the Evers' translation of the invention's operation but merely challenges Evers' opinions. Whatever the merit of Evers' opinions, the fact remains that Pedersen made full disclosure and did not try to conceal anything from the U.S. Patent Office.

**Analysis – Patent Expiration and Reinstatement**

119. The Court finds that the original expiration of the '587 patent, and the entire period of delay thereafter, was unintentional.

**Findings of Fact & Conclusions of Law - 18**

120. At the time of the expiration, 55 Brake was a patent licensing firm with a contractual commitment to a licensee – WABCO – to maintain its patents, including the '587 patent.

121. All of 55 Brake's principals believed that the '587 patent was critical to their business model, and none wanted the patent to expire.

122. The '587 patent expired due to the confusion caused by changes in top management and the fact that the official in charge when the expiration took place, MacGregor, was a rancher focusing on his cattle rather than the payment of patent fees.

123. Failing to pay the fees of such a critical asset was certainly negligent. But even if it could be deemed grossly negligent, the failure did not rise to the level of inequitable conduct under the authorities cited above.

124. MacGregor did not understand that the patent had expired until he was so informed at a meeting in the Denver airport in 2007.

125. After that Denver airport meeting, 55 Brake took immediate action to reinstate the '587 patent.

126. Babbitt's interviews provided a reasonable basis for the representation to the U.S. Patent Office that the expiration and delay was unintentional.

**Conclusion**

127. The Court therefore concludes VGA failed to meet its burden of proving the '587 patent at issue is unenforceable on the basis of inequitable conduct.

**Findings of Fact & Conclusions of Law - 19**



DATED: **June 2, 2011**

B. LYNN WINMILL
Chief Judge
United States District Court